UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

JOSHUA LEE TEVIS, )
)
    Petitioner, )
)
v. )     No. 5:17-CV-118-JMH-REW
)
RAVONNE SIMS, Warden, )    RECOMMENDED DISPOSITION
)
    Respondent. )

\* \* \* \* \* \* \* \* \* \*

Petitioner, Joshua Tevis, is a Kentucky inmate. DE #1 (Petition), at 1. On December 11, 2014, a Fayette Circuit Court jury convicted him of reckless homicide and being a persistent felony offender (PFO) in the first degree. *See Tevis v. Commonwealth*, No. 2015-CA-213-MR, 2016 WL 1273040, at \*1 (Ky. Ct. App. Apr. 1, 2016). The court sentenced him to fifteen (15) years in prison. *See id.*; DE #16-2, at 11-13 (1/28/15 Final Judgment). On March 6, 2017,[1] Petitioner filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. DE #1. The Court conducted an initial review of the filing and found it to appear timely and in the correct form. DE #6 (Order). On May 15, 2017, Warden Ravonne Sims responded. DE #16 (Response). Tevis replied. DE #18 (Reply). Having reviewed the submissions under the applicable standards, the Court **RECOMMENDS** that the District Judge **DISMISS** the petition (DE #1) **WITH PREJUDICE** and wholly **DENY** a Certificate of Appealability. Petitioner fails in all respects to justify displacing the treatment of the matter by the courts of the Commonwealth.

---

[1] This date reflects the prison mailbox rule. *See Richard v. Ray*, 290 F.3d 810, 812-13 (6th Cir. 2002) (per curiam). Here, Tevis affirmed under penalty of perjury that he placed the petition in the prison mailing system on March 6, 2017. DE #1, at 15.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Kentucky Court of Appeals articulated the underlying facts and procedural background:

> At approximately 2:30 a.m. on September 22, 2013, Tevis exited the Diva's Gentleman's Club in Lexington and walked to his vehicle. At the same time, Johntel Crocker and others were attempting to separate two women who were fighting near Tevis's vehicle. As Tevis approached his vehicle, he observed Crocker step on the rear bumper of his vehicle. Tevis took exception to this and exchanged words with Crocker as they crossed paths. Crocker paused, turned, and shoved Tevis against a wall. Almost immediately, Tevis pulled a gun and shot Crocker in the chest. Crocker ran, but collapsed moments later. Tevis fled the scene on foot, leaving his vehicle behind. When police arrived moments later, they found Crocker unresponsive. Officers and paramedics rendered first-aid; however, Crocker was pronounced dead upon arrival at the hospital.

> During their investigation, police obtained the surveillance video of the Diva's parking lot and eventually determined that Tevis was the individual who shot and killed Crocker. Soon afterward, Tevis turned himself in to the Lexington Police Department, and authorities charged him with Crocker's murder.

> On November 25, 2013, a Fayette County Grand Jury indicted Tevis for murder, being a convicted felon in possession of a handgun, and being a PFO in the first degree. The case proceeded to trial on December 9, 2014. At trial, Tevis's theory of the case was that he shot Crocker in self-defense. At the conclusion of a three-day trial, the jury returned a verdict of not guilty on the charge of murder. However, the jury convicted Tevis of reckless homicide, and found him to be a persistent felony offender in the first degree. The trial court imposed the recommended sentence of five years for the reckless homicide, enhanced to fifteen years by virtue of Tevis's conviction as a persistent felony offender.

*Tevis*, 2016 WL 1273040, at *1 (footnote omitted).

Tevis appealed; on April 1, 2016, the Kentucky Court of Appeals affirmed. *Id.* at *3. On August 17, 2016, the Kentucky Supreme Court denied discretionary review. *See id.* at *1 (noting such denial); DE #16-2, at 105 (Order Denying Discretionary Review). Tevis then filed a petition for a writ of certiorari, which the United States Supreme Court denied. *Tevis v. Kentucky*, 137 S. Ct. 674 (2017). Remaining dissatisfied, on March 6, 2017, Tevis timely filed the current federal petition for a writ of habeas corpus. *See* DE #1.

## II.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended 28 U.S.C. § 2254, established a "'highly deferential standard for evaluating state-court rulings,' which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 125 S. Ct. 847, 853 (2005) (quoting *Woodford v. Visciotti*, 123 S. Ct. 357, 360 (2002) (per curiam)). Specifically, the AEDPA provides,

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). In contrast, when a state court has not addressed in any manner the merits of a properly presented claim, the reviewing federal court assesses the claim *de novo*. *Van v. Jones*, 475 F.3d 292, 293 (6th Cir. 2007). A petitioner bears the burden of justifying relief. *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (quoting *Caver v. Straub*, 349 F.3d 340, 351 (6th Cir. 2003)).

"Under the 'contrary to' clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.'" *Williams v. Taylor*, 120 S. Ct. 1495, 1523 (2000) (O'Connor, J., opinion of the Court for Part II)). In this regard, "clearly established law under the Act encompasses more than just bright-line rules laid down by the Court. It also clearly includes

3

legal principles enunciated in the Court's decisions." *Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir. 2002). At the same time, habeas review focuses on the holdings of the Supreme Court, not its *dicta* or holdings of the courts of appeals. *Williams*, 120 S. Ct. at 1523 (regarding *dicta*); *id.* at 1507 (quoting *Lindh v. Murphy*, 96 F.3d 856, 869 (7th Cir. 1996)) (regarding reliance on jurisprudence from courts of appeals).

As to the "unreasonable application" clause, the Supreme Court has held that "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 120 S. Ct. at 1523. The writ may not issue solely because the state court incorrectly applied the relevant Supreme Court precedent; instead, the state court's misapplication must have been objectively unreasonable. *Id.* at 1521-23. In determining whether the state court misapplied Supreme Court precedent, a federal court may look only to the state of the case law "as of the time of the relevant state-court decision." *Id.* at 1523. Ultimately, the habeas court should not grant relief "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 124 S. Ct. 2140, 2149 (2004)).[2]

---

[2] The Supreme Court has repeatedly cautioned courts in this Circuit about the rarity of warranted relief under § 2254. *See, e.g.*, *Jenkins v. Hutton*, 137 S. Ct. 1769, 1773 (2017) (per curiam) (bluntly stating, *e.g.*, "the Sixth Circuit was wrong"). The AEDPA standard is "difficult to meet." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013)). State mishandling, under subsection (d), must essentially be inarguable. *See Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) ("[F]ederal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong."). Unless the state transgresses the clearly established *holdings* of the Supreme Court, or applies them so unreasonably as to exceed fair doubt, statute-based deference commands that the federal courts resist involvement. *See Burt v. Titlow*, 134 S. Ct. 10, 15-16 (2013) ("Recognizing the duty and ability of our state-court colleagues to adjudicate claims of constitutional wrong, AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.").

Concerning any "unreasonable determination of the facts" theory, a federal court must presume all determinations of factual issues by the state court to be correct unless the petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).[3] Findings of fact entitled to the presumption include "[p]rimary or historical facts found by state courts," *Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir. 2000), as well as factual findings made by state appellate courts based upon the trial record. *Bowling v. Parker*, 344 F.3d 487, 497 (6th Cir. 2003) (citing *Sumner v. Mata*, 101 S. Ct. 764, 769 (1981)). However, the presumption does not fully apply when, as with an ineffective assistance claim resolved on the merits, the § 2254 petition involves mixed questions of law and fact. *See Strickland v. Washington*, 104 S. Ct. 2052, 2070 (1984); *Ramonez v. Berghuis*, 490 F.3d 482, 487 (6th Cir. 2007). In essence, while federal courts need not defer to ultimate findings regarding, *e.g.*, ineffectiveness of counsel, the

---

[3] There is some lack of clarity concerning the interplay between §§ 2254(d)(2) and 2254(e)(1). Each distinctly assures a measure of deference to state court factual determinations. Although the Supreme Court declined to guide the interaction in *Wood v. Allen*, 130 S. Ct. 841, 845 (2010), the Sixth Circuit has said,

> With respect to § 2254(d)(2), "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court-proceeding[.]"

*Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (quoting *Miller-El v. Cockrell*, 123 S. Ct. 1029, 1041 (2003)); *see also McMullan v. Booker*, 761 F.3d 662, 670 & 670 n.3 (6th Cir. 2014); *Shimel v. Warren*, 838 F.3d 685, 697 (6th Cir. 2016); *Rice v. White*, 660 F.3d 242, 254 n.6 (6th Cir. 2011). In fact, the Sixth Circuit recently acknowledged that "the interplay between § 2254(e)(1) and § 2254(d)(2) remains unresolved." *Hawkins v. Woods*, 651 F. App'x 305, 309 n.2 (6th Cir. 2016); *see also Rice*, 660 F.3d at 254 n.6 (eschewing the opportunity to clarify "the precise interplay between § 2254(d)(2) and (e)(1)"). The (d)(2) overlay is "demanding but not insatiable." *Ayers*, 623 F.3d at 308 (quotation omitted); *see also Feldman v. Thaler*, 695 F.3d 372, 377 (5th Cir. 2012) (describing (e)(1) as a "supplement[]" to (d)(2), providing an "'arguably more deferential' standard of review for state court findings of fact") (citation omitted).

"underlying facts" supporting such state court decisions still warrant deference. *Strickland*, 104 S. Ct. at 2070; *accord Abdur'Rahman v. Bell*, 226 F.3d 696, 702 (6th Cir. 2000).

Even absent an opinion articulating the state court's reasoning, a habeas court yet must determine whether the state court's decision is the result of an unreasonable legal or factual conclusion. *Harrington*, 131 S. Ct. at 784. Indeed, "a state court need not cite or even be aware of [the Supreme Court's] cases under § 2254(d). . . . Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id.* Unless the petitioner affirmatively shows that the state court's decision "did *not* involve a determination of the merits of his claim," such as where the opinion expressly states the claim was denied on procedural grounds, § 2254(d) applies on habeas review. *Id.* at 784-85. Where the state court resolves a petitioner's claim of error without articulating its reasons for the denial, then:

> Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

*Id.* at 786; *accord Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000) (independent review where state court does not articulate reasoning for denial is "not a full, de novo review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA").

If errors occurred, the reviewing court must evaluate whether they constitute "trial errors, . . . whose effect may be 'quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt,'" or "'structural defects,' which 'defy analysis by harmless error.'" *Jensen v. Romanowski*, 590 F.3d 373, 378 n.4

6

(6th Cir. 2009) (citing and quoting *Brecht v. Abrahamson*, 113 S. Ct. 1710, 1717 (1993)). With "trial errors," the reviewing court evaluates directly whether the error had a substantial and injurious effect in determining the jury's verdict or other case result. *Id.* at 378. The query focuses on whether "grave doubts" exist as to the effect of error. *Id.* at 379 (citing *O'Neal v. McAninch*, 115 S. Ct. 992, 994 (1995)). If any error had little or no effect, then no habeas relief should be afforded. *Id.* However, if the reviewing court finds itself at least in "virtual equipoise" about the harmlessness of the error, the court must grant the writ. *Id.* As to "structural defects," reversal of the state-court conviction may be required without harmless error analysis. *Id.* at 378 n.4. Generally, federal habeas corpus relief does not lie for errors in the application of state law unless such errors result in the denial of a fundamentally fair trial. *See Estelle v. McGuire,* 112 S. Ct. 475, 479-80 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions[.]"); *accord Brooks v. Anderson*, 292 F. App'x 431, 437 (6th Cir. 2008).

## III.    ANALYSIS

Tevis raises two general grounds for relief: (1) the jury potentially viewing certain excluded video portions, and (2) certain alleged indirect prosecutor references to Tevis's election against testifying on his own behalf at trial. *See* DE #1, at 5-7; *see generally* DE #1-2 (Tevis's memorandum further explaining the arguments). The Warden opposes relief on each ground. *See* DE #16. Tevis replied. DE #18. The Court addresses each argument in turn.

### A.    *The Video*

A video of the shooting was at the core of the proof. The overall surveillance tape was an hour long, but the parties agreed that only about 12 minutes, surrounding the altercation, would be admitted. *See Tevis*, 2016 WL 1273040, at *2 (Court of Appeals narrating the events: "During

trial, the Commonwealth sought to introduce surveillance video footage from the night of the shooting. Tevis objected to the introduction of the entire sixty-minute video and asked the court that the Commonwealth only be allowed to show a select portion of the video instead. The Commonwealth agreed and only introduced approximately twelve minutes of the footage."). The Court admitted the 12 minutes, but the DVD sent back to the jury room contained the full hour. *See* DE #14, at Disc labeled "22-4-14 DVD 210-3 12-11-14," at 11:07:45 a.m. (trial court citing beginning point on tape and admonishing the jury, moments before deliberations began, to "limit" its "viewing" to the "particular segment" that "was introduced into evidence").

First, Tevis argues that the "State Court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States when the jury was allowed to view excluded evidence beyond counsel's objection." DE #1, at 5 (all as in original). Petitioner contends that "the Jury had no way of properly following the admonition due to the relevant portion being at the latter end of the video rather than the beginning." *Id.* (all as in original). Tevis claims that the video began at approximately 11:00 p.m., although the "incident happened around 2:00 a.m.,"[4] thus (per Petitioner) "showing prejudicial activities unrelated to [his] case." *Id.* Even "if the Jury attempted to follow the admonition," Tevis claims, "the mere act of fast forwarding the video . . . involuntarily enables the access to prejudicial character evidence[.]" *Id.*

The Kentucky Court of Appeal's discussion of this argument, in full, is the following:

Tevis's . . . argument is that the trial court erred when it allowed the jury to access excluded evidence. During trial, the Commonwealth sought to introduce surveillance video footage from the night of the shooting. Tevis objected to the

---

[4] The at-issue surveillance video is, in fact, approximately one hour long, which Tevis himself later acknowledges. DE ##1-2, at 7 (Petitioner referencing the "approximately sixty minutes of parking lot surveillance footage"); 18, at 3 ("The footage of the incident was approximately 1hr long[.]" (all as in original)); *id.* at 4.

introduction of the entire sixty-minute video and asked the court that the Commonwealth only be allowed to show a select portion of the video instead. The Commonwealth agreed and only introduced approximately twelve minutes of the footage. However, the disc tendered to the court and assessable to the jury during deliberations contained the full sixty-minute video.

It is "a fundamental principle that the state must establish guilt solely on the basis of evidence produced in the courtroom under safeguards assuring a fair trial." *Smith v. Commonwealth*, 645 S.W.2d 707, 710 (Ky. 1983). Although Kentucky Rules of Criminal Procedure (RCr) 9.72 permits the trial court to exercise discretion over the evidence the jury may take with it to deliberations, the court abuses that discretion when it permits the jury to take testimonial witness statements to the jury room. *See McAtee v. Commonwealth*, 413 S.W.3d 608, 622 (Ky. 2013) and RCr 9.74. In *Commonwealth v. Wright*, 467 S.W.3d 238 (Ky. 2015), the Supreme Court held that a recording of a controlled drug buy was an exhibit, and not testimonial. Thus the trial court may properly allow the jury to review the recording in the deliberation room, and the mere possibility that the jury could have access to excluded evidence was not sufficient to show reversible error. *Id.* at 243-44.

The current case is comparable. While the surveillance video qualified as an exhibit under RCr 9.72, it included video which had been excluded. Therefore, the trial court's decision to allow the jury access to the portions of the video that were not introduced into evidence may have been ill-advised; but the court, by admonishing the jury to view only the twelve-minute relevant portion of the video, took steps to prevent the jury's actually viewing of the excluded portions. The jury is presumed to have followed this admonition; and, unless the defendant can rebut this presumption, the admonition cures any error. *See Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003).

Our Supreme Court has recognized that there are two ways for a defendant to overcome the presumptive efficacy of an admonition: (1) when there is an overwhelming probability that the jury will be unable to follow the court's admonition and there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant, or (2) when the question was asked without a factual basis and was inflammatory or highly prejudicial. *See Johnson* at 441 (internal quotations and citations omitted).

Tevis's claim that the jury "clearly" viewed the excluded portions of the video and that it impacted the jury's verdict is unsupported in the record. During a bench conference, the court informed both parties that while the jury was in deliberations after the guilt phase, it requested the time stamp for the beginning of the relevant portion of the surveillance video. This strongly suggests that the jury followed the court's admonishment and only viewed the surveillance video's relevant portion. Tevis has failed to overcome the presumptive efficacy of the trial court's admonition to the jury.

*Tevis*, 2016 WL 1273040, at *2-*3.

In DE #1, Tevis identifies but one United States Supreme Court case he contends the Kentucky courts unreasonably applied: *Kotteakos v. United States*, 66 S. Ct. 1239 (1946). Petitioner changes tack significantly in reply, regurgitating the cases the Warden cites in response, though reconfiguring the arguments to fit his own claims.

Tevis first isolates one passage from *Kotteakos*:

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

66 S. Ct. at 1248. Tevis here "contends that the Kentucky [court] ignore[d] the fair-assurance standard[.]" DE #1-2, at 11. The Sixth Circuit has called this *Kotteakos* quotation simply "the traditional formulation of the harmless error standard[.]" *Beck v. Haik*, 377 F.3d 624, 635 (6th Cir. 2004)*, overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009) (en banc) (concerning spoliation choice of law). In *Kotteakos*, "error permeated the entire charge, indeed the entire trial." 66 S. Ct. at 1250. "Moreover," in that conspiracy case, "the effect of the court's misconception extended also to the proof of overt acts." *Id.* Indeed, the

> indictment charged a single conspiracy only; the proof showed more than one; the instructions told the jury erroneously that on the evidence they could find the defendants guilty of a single confederation; must find that each defendant joined it, in order to convict; must consider the evidence as to each separately on this phase; but, once satisfied concerning that, could attribute to each one found to be a member any act done by any other co-conspirator in furtherance of 'the scheme' as an overt act, again in obvious error; and in neither case, of course, was there precaution to keep separate conspiracies separate.

*Id.* at 1251. In the circumstances, the Supreme Court found the "dangers for transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place." *Id.* at 1252. That is wholly unlike the situation here, where Tevis challenges the jury's potential consideration of but a portion of one video, which (as footage of a parking lot while Tevis was absent) did not even directly involve or implicate him.

Additionally, the Supreme Court has provided additional clarity, in concrete scenarios similar to the one the Court now faces, since the aged (70+ years old) *Kotteakos*. For example, the Supreme Court has cautioned that "unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required." *Schneble v. Florida*, 92 S. Ct. 1056, 1060 (1972). Further, a "jury is presumed to follow its instructions," *Weeks v. Angelone*, 120 S. Ct. 727, 733 (2000), and it "is not unreasonable to conclude that . . . the jury can and will follow the trial judge's instructions to disregard [improperly admitted] information." *Bruton v. United States*, 88 S. Ct. 1620, 1627 (1968) (recognizing that "instances occur in almost every trial where inadmissible evidence creeps in," and thus that "[n]ot every admission of inadmissible . . . evidence can be considered to be reversible error unavoidable through limiting instructions"). As the Supreme Court has pointedly put it: "A defendant is entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 73 S. Ct. 481, 490 (1953) (holding introduction of "one item of hearsay evidence" harmless).

The Court has viewed the entirety of the at-issue video (part of the conventional filing at DE #14, and later isolated and publicly filed at DE #21) for itself. The Court can confidently say, after watching the full video, that this factual scenario is manifestly not one "in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so

vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton*, 88 S. Ct. at 1627 (regarding admission of hearsay evidence of a co-defendant's confession implicating the defendant—what the Court labeled "the powerfully incriminating extrajudicial statements of a codefendant"). Neither is this scenario one where "there is an 'overwhelming probability' that the jury w[ould] be unable to follow the court's instructions" and "a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer v. Miller*, 107 S. Ct. 3102, 3109 n.8 (1987) (cited by Tevis). As already recounted, even assuming the jury viewed the excluded video portions (or, more likely, fast-forwarded through them), the jury would have merely seen (mostly mundane) footage of a parking lot, not involving Tevis (or implicating him in crime or prejudicial conduct) in any way. Indeed, Tevis himself directly characterizes the antecedent footage as "unrelated to [his] case." DE #1, at 5. Such disparate proof—involving neither the crime nor suspect at issue—is patently not "powerfully incriminating extrajudicial" evidence, *Bruton*, 88 S. Ct. at 1628, or "incriminating evidence of the most persuasive sort, ineradicable, as a practical matter, from the jury's mind." *Kansas v. Carr*, 136 S. Ct. 633, 645 (2016) (noting the Court has "declined to extend" the singular *Bruton* "exception" beyond *Bruton*'s facts). More to the point, in this AEDPA-governed context, Kentucky's treatment, harmonious with the Court's independent analysis, was clearly not an unreasonable one.[5] "Judicious application of the harmless-error rule does not require that [the

---

[5] Thus, Tevis's speculation about what the jury *might* have done while deliberating (or, more accurately, the inferences the jury *might* have drawn from actions it *might* have taken), *see* DE #18, at 7 (Tevis conceding that "there is no way of knowing if the only portions of the video viewed were the relevant portions"), earns him no relief. The United States Supreme Court has held that courts may, almost always, assume juries follow limiting instructions, a presumption Kentucky has particularized and reasonably applied here. Even assuming, though, that Tevis's speculation is correct and confronting *Kotteakos* on its own terms, the Court, in this case, can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." 66 S. Ct. at

Court] indulge assumptions of irrational jury behavior when a perfectly rational explanation for the jury's verdict, completely consistent with the judge's instructions, stares [it] in the face." *Schneble*, 92 S. Ct. at 1059; *see also, e.g.*, *United States v. Layne*, 192 F.3d 556, 574 (6th Cir. 1999).

This case is also dissimilar to *Bates v. Preble*, 14 S. Ct. 277 (1894), which the parties discuss at length.[6] There, the Supreme Court decried error when the trial court allowed "the whole of [a] memorandum book to go to the jury without any sealing or other protection of the leaves and pages not put in evidence." *Id.* at 279. Although "the court directed the jury not to examine any part of the book, except what was put in evidence, [it] permitted the whole book with that instruction to go to the jury." *Id.* The Supreme Court labeled this error: "We think the court should have adhered to its directions to take such measures as were necessary to prevent the jury from seeing other portions of the book, as they contained matter which, though bearing upon the issue, was wholly inadmissible as testimony, and was calculated to create in the minds of the jury a strong prejudice against the defendants." *Id.* (holding the mistake "not cured by the instructions to the jury not to examine any part of the book, except what was put in evidence"). The Supreme Court recognized, though, that such instructions "might have healed the error, if the contents of the book had been unimportant." *Id.* "But," the Court commented, "the

---

1248. The Court sees no logical connection between possible third-party public urination or other, unrelated parking lot activity (whether any such activity was criminal is distinctly indeterminate, to the Court, *see* DE #18, at 6 (Tevis acknowledging the actions merely could "be easily construed" as such)) and Tevis's fear or ultimate guilt. Tevis was not on trial for public urination, prostitution, or drug trafficking; he was on trial for killing Johntel Crocker, and the admitted video portion—plainly showing Tevis shooting Crocker, indiscriminately firing several more volleys, Crocker running away (through the parking lot), and collapsing a few moments later—obviously provided a full basis for the jury's carefully chosen verdict. Forty-eight benign minutes of random persons in the lot would have had no negative effect.

[6] The last time any federal court cited *Bates*, now in its 123rd year, was 1970—itself 47 years ago. *See Farese v. United States*, 428 F.2d 178 (5th Cir. 1970).

objectionable portions in this case were such as were likely to attract the eye of the jury, and accident or curiosity would be likely to lead them, despite the admonition of the court, to read the plaintiff's comments upon the defendants, and her private meditations, which had no proper place in their deliberations."

Whatever continuing import the *Bates* ruling has (which is (at least) questionable, given its pre-harmless-error-rule discussion, its sheer age, and the 47 years since any federal court has relied on it),[7] the Court finds the Kentucky courts to have not transgressed it here (and certainly not unreasonably so). In *Bates*, the excluded book portions contained "the plaintiff's comments upon the defendants" and "her private meditations"—highly prejudicial information, in context. *Id.* The excluded portions of the video here, on the other hand, contained (per Tevis's characterization and the Court's own viewing) patently "unimportant" content vis-à-vis Tevis's accused criminality, thus presenting a scenario the Supreme Court contemplated as remediable via curative instructions, the route Judge Goodwine reasonably took here. *See* DE #14, at Disc labeled "22-4-14 DVD 210-3 12-11-14," at 11:07:45 a.m. (the trial court stating: "Some of the video, the CDs, or discs that you have may have more video on it than what was introduced. You're limited to what was introduced into evidence. . . . Just limit your viewing of that to that particular segment.").[8] The *Bates* book is wholly different[9] (and certainly not "materially indistinguishable") from the *Tevis* video. *See Williams*, 120 S. Ct. at 1519-20.

---

[7] Via the Supreme Court's "unimportant" caveat, the Court really perceives *Bates* to substantially mirror—or at least not be outright irreconcilable with—the high court's subsequent harmless error jurisprudence. *See, e.g., Sartain v. United States*, 16 F.2d 704, 706-07 (5th Cir. 1927) (citing *Bates* for a general rule of law but "conclud[ing] that the error in admitting this evidence was purely formal, and not prejudicial," and thus affirming convictions); *Schoborg v. United States*, 264 F. 1, 9 (6th Cir. 1920) (distinguishing *Bates*); *Davis v. Louisville Trust Co.*, 181 F. 10, 13-14 (6th Cir. 1910) (rejecting reliance on *Bates* for a particular proposition).

[8] The record simply does not support Tevis's contrary arguments. *See, e.g.*, DE #18, at 3-4. Judge Goodwine specifically told the jury to watch *only* the introduced video segment; that is no

Kentucky's treatment of this issue was reasonably consistent with these principles and this case law. The court of appeals found the record—particularly the jury's mid-deliberation request for "the time stamp for the beginning of the relevant portion of the surveillance video"—to "strongly suggest[] that the jury followed the court's admonishment [to] only view[] the surveillance video's relevant portion." *Tevis*, 2016 WL 1273040, at *3.[10] Further, the court held Tevis's arguments that the jury, in fact, "viewed the excluded portions of the video" and that any such perception "impacted the jury's verdict" to be "unsupported in the record." *Id.* Kentucky's courts, per the above discussion, did not here unreasonably apply or reach a decision contrary to *Kotteakos*, *Carr*, *Bruton*, or *Bates* in rejecting this line of Tevis's argument or Tevis's overall claim.

B.    *The Prosecutor's Statements*

Second, Tevis argues that the "State Court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the U.S. when [his] right to self-incrimination was violated by the prosecutor's repeated indirect references to his failure to take the stand." DE #1, at 7. Specifically, Tevis claims the

---

boilerplate, "vague[,] blanket admonition." *Id.* at 4. She even orally identified the timestamped starting point. *See* DE #14, at Disc labeled "22-4-14 DVD 210-3 12-11-14," at 11:07:56 a.m. (the trial court identifying "counter number 14:33," reflecting the starting video timestamp).

[9] Tevis, only in reply, characterizes *Bates* as "the same" as his case, DE #18, at 6, and later that "the spirit of" *Bates* "is exactly the situation" of his case, *id.* at 7. Petitioner's extended comments actually show how the cases differ: Tevis says the surveillance video generally depicts "a type of environment that looked to be highly dangerous and contain all kinds of illegal activity." *Id.* at 6. Again, as the Supreme Court carefully detailed, that generalized complaint is wholly different from the particular, case-specific prejudice the *Bates* book threatened. Further, Tevis over-hypes the video content to a misleading degree.

[10] The Court sees no logic (or record support) to Tevis's argument that the fact that this request came amid the punishment phase of trial signified that the jury "had already reviewed the footage during the guilt phase, using this as consideration in the finding of guilt." DE #18, at 5. The trial court had already told the jury the timestamp beginning, and simply asking for a reminder of that, in the second deliberation phase, has no logical bearing in attempting to divine first-phase jury behavior.

prosecutor violated the Constitution when he told the jury that it "could not 'assume' from a video that Petitioner feared for his life and that [it] heard no testimony from any witness that the Petitioner feared for his life." *Id.* Tevis faults this comment (and later variants) based on the assertion that only he himself "could have testified to his personal fear[.]" *Id.* "[T]he prosecution[']s comments in this case," Petitioner baldly contends, "would have affected the outcome of the jury's decision[.]" *Id.*

The Kentucky Court of Appeals resolved this contention, reasoning in full:

"In any criminal or penal prosecution the defendant, on his own request, shall be allowed to testify in his own behalf, but his failure to do so shall not be commented upon or create a presumption against him." KRS 421.225. Comments, direct or indirect, violating a defendant's privilege against self-incrimination can be grounds for reversing a sentence. *Williams v. Commonwealth*, 154 S.W.2d 728, 729 (Ky. 1941). However, "a comment violates a defendant's constitutional privilege against compulsory self-incrimination only when it was manifestly intended to be, or was of such character that the jury would necessarily take it to be, a comment upon the defendant's failure to testify." *Ragland v. Commonwealth*, 191 S.W.3d 569, 589-90 (Ky. 2006), *citing Butler v. Rose*, 686 F.2d 1163, 1170 (6th Cir. 1982); *see also Byrd v. Commonwealth*, 825 S.W.2d 272, 275 (Ky. 1992); *Knowles v. United States*, 224 F.2d 168, 170 (10th Cir. 1955). Overall, "prosecutorial comment must be examined in context, and, if there is another, equally plausible explanation for a statement, malice will not be presumed and the statement will not be construed as comment on the defendant's failure to testify." *Ragland v. Commonwealth*, 191 S.W.3d 569, 590 (Ky. 2006) (internal citations omitted).

During closing arguments, the Commonwealth argued that Tevis could not possibly have acted in self-defense. The Commonwealth stated, in part, "there has been no evidence from any witness that you heard that the defendant feared for his life. There has been no evidence that he shot because he couldn't, he had nowhere else to go." Tevis's counsel immediately objected to this statement. At the ensuing bench conference, his counsel argued that the statement was an indirect comment on his right to remain silent because he was the only witness who could testify as to his state of mind. The trial court overruled the objection, finding that the statement was a permissible comment on the evidence presented. Moments later, the Commonwealth again reminded the jury that it had "heard no witness say that the defendant feared for his life." Tevis objected again, and the trial court again overruled him. The Commonwealth continued to argue that the jury could not assume that Tevis shot Crocker because he feared for his life, stating, "[y]ou can't do that. You are confined to the evidence before you." The

trial court later provided an instruction to the jury which stated: "The Defendant is not compelled to testify, and the fact that the Defendant does not testify is not an inference of guilt and shall not prejudice the Defendant in any way."

Tevis insists that the Commonwealth's statements in its closing argument were an indirect comment on his failure to testify in his own defense because he was the only person who could have provided information about what he felt and believed when he used deadly force. We disagree.

In *Commonwealth v. Robertson*, 431 S.W.3d 430 (Ky. App. 2014), a sexual abuse case, we construed the Commonwealth's repeated statements regarding the victims' "unrefuted" testimony as a cumulative and inadmissible comment on Robertson's silence at trial. More specifically, the Commonwealth stated, "this defendant cannot give you any reason why these children would make this up." *Id.* at 433. The facts in this case do not contain such egregious and direct references.

The Commonwealth's comments in the present case were not manifestly intended to reflect on Tevis's failure to testify. There were several witnesses to the events leading up to Tevis's shooting of Crocker. Taken in context, the Commonwealth's statements merely alluded to the fact that the jury heard no testimony from any witness that would support Tevis's claim that he feared for his life. This was permissible. *See Stopher v. Commonwealth*, 57 S.W.3d 787, 806 (Ky. 2001), *quoting Slaughter v. Commonwealth*, 744 S.W.2d 407 (Ky. 1987) ("A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of the defense position.").

*Tevis*, 2016 WL 1273040, at *1-*2.

Tevis identifies but one, although the central, United States Supreme Court case on this question: *Griffin v. California*, 85 S. Ct. 1229 (1965). *See* DE ##1-2, at 16; 18, at 11. He argues the Kentucky courts unreasonably applied, and reached a conclusion contrary to, *Griffin*. The Warden opposed, DE #16, at 26-27, and Tevis replied, DE #18, at 9-12.

The Fifth Amendment (applicable to the Commonwealth through the Fourteenth) indeed "prohibits comment on the defendant's silence[.]" *Griffin*, 85 S. Ct. at 1232 n.5. Simply put, the "prosecution may not comment on a defendant's refusal to testify." *Webb v. Mitchell*, 586 F.3d 383, 395 (6th Cir. 2009). Tevis essentially complains that by remarking on a lack of evidence regarding Tevis's fear (as relevant to the self-defense theory)—when, Tevis says, only he could

testify as to his own fear[11]—the prosecutor implicitly (and unconstitutionally) commented on Defendant's refusal to testify. The problem for Tevis, under the applicable AEDPA standard, is that "the Supreme Court has not held that such comments invariably violate *Griffin*." *Webb*, 586 F.3d at 397 (rejecting a similar argument regarding the prosecutor's reference "to a piece of evidence as 'uncontradicted' that only Webb could have contradicted"). Simply put, there is no "clearly established Federal law as determined by the Supreme Court of the United States" that a prosecutor indirectly[12] commenting on an accused's silence in the manner the Commonwealth here did violates the Constitution. *See Edwards v. Roper*, 688 F.3d 449, 460 (8th Cir. 2012) (rejecting a similar claim for a "basic reason: the Supreme Court has never clearly established that a prosecutor may not comment on the evidence in a way that indirectly refers to the defendant's silence"); *Yancey v. Gilmore*, 113 F.3d 104, 106-07 (7th Cir. 1997) (rejecting a similar argument, under the AEDPA, despite contrary Circuit precedent, regarding "indirect references to a defendant's failure to testify" as "without a Supreme Court case to support [the] claim"); *cf. Lockett v. Ohio*, 98 S. Ct. 2954, 2959-60 (1978) (rejecting a claim that "the prosecutor's repeated references in his closing remarks to the State's evidence as 'unrefuted' and

---

[11] The Court sharply disagrees with the general premise of the argument—that only a defendant can provide competent proof of his own fear. As the Commonwealth put it earlier in the case, "Certainly, the only person who could have directly testified as to Tevis' mind set at the moment of the shooting was Tevis himself, but other witnesses could have testified to facts indicative of Tevis being in fear; none did. For instance, witnesses potentially could have testified about Tevis' demeanor, or that his body language conveyed fear. Witnesses could have testified about whether Tevis said anything suggesting his fear." DE #16-2, at 59-60 (all as in original); *see also, e.g.*, *Bryant v. State*, 17 So. 3d 713, 715-16 (Fla. Dist. Ct. App. 2009) (holding lay witness testimony regarding an accused's fear proper: "The trial court abused its discretion by preventing Byrd from testifying that Bryant appeared fearful, because the evidence was both admissible and relevant to his self-defense claim."); *United States v. Burks*, 470 F.2d 432, 435 n.5 (D.C. Cir. 1972) (countenancing, in a self-defense scenario, that "[e]xtrinsic proof" may be "relevant to the question whether the defendant did, in fact, fear injury at the hands of the decedent"); *Carnes v. Commonwealth*, 453 S.W.2d 595, 597-98 (Ky. Ct. App. 1970). There were many parking lot witnesses to that night's violence.

[12] "Indirect" is the word Tevis himself uses. DE #1, at 7.

'uncontradicted' constituted a comment on [Defendant's] failure to testify and violated her Fifth and Fourteenth Amendment rights").[13]

Even evaluating Tevis's contention under the Sixth Circuit's generally applicable test, the Court looks to four factors (which, again, do not constitute clearly established Federal law as determined by the Supreme Court): "1) Were the comments 'manifestly intended' to reflect on the accused's silence or of such a character that the jury would 'naturally and necessarily' take them as such[?]; 2) were the remarks isolated or extensive[?]; 3) was the evidence of guilt otherwise overwhelming[?]; [and] 4) what curative instructions were given and when[?]" *Bowling*, 344 F.3d at 514. The analysis calls for a review of the totality. *Byrd v. Collins*, 209 F.3d 486, 533 (6th Cir. 2000). Here, as the Kentucky Court of Appeals already reasonably concluded, conducting a substantially similar elemental state-law evaluation, the factors weigh in favor of finding no constitutional violation.

The Court has viewed all relevant trial video for itself. First, the Court agrees that the prosecutor's statements here were not manifestly intended to comment on Tevis's silence and not likely to be taken as such. Rather, the "statements merely alluded to the fact that the jury heard no testimony from *any* witness that would support Tevis's claim that he feared for his life." *Tevis*, 2016 WL 1273040, at *2 (emphasis added). Indeed, the prosecutor himself said, "there has been no evidence from *any* witness *that you heard* that the defendant feared for his life." *Id.* (emphases added). The prosecutor emphasized as much—*i.e.*, his focus on the witnesses who actually testified—at the bench conference following the first objection: "I prefaced my

---

[13] Indeed, "the Supreme Court has itself explicitly construed *Griffin* to prohibit only those comments that directly equate a defendant's decision not to testify with his guilt. *See Portuondo v. Agard*, 529 U.S. 61, 69, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000); *United States v. Robinson*, 485 U.S. 25, 32, 108 S. Ct. 864, 99 L. Ed. 2d 23 (1988)." *Diggs v. Hulick*, 236 F. App'x 212, 215 (7th Cir. 2007).

comments with, 'there is no evidence from the witness stand you've heard so far.'" DE #14, at Disc labeled "22-4-14 DVD 210-3 12-11-14," at 10:55:40 a.m. "[T]he question is not whether the jury possibly or even probably would view the statements as comments on the defendant's failure to testify, but whether the jury *necessarily* would have done so." *Byrd*, 209 F.3d at 534 (internal quotation marks removed; italics added). Tevis does not meet that standard here.[14]

Second, the remarks were fairly isolated. *Compare id.* (holding that 3 complained-about statements "were relatively isolated [and] few in number")*, and United States v. Bond*, 22 F.3d 662, 669 (6th Cir. 1994) (holding 3 paragraphs of comments were isolated)*, with Lent*, 861 F.2d at 977 (holding that "five remarks were extensive, not isolated"). The remarks here were insulated, singular comments within an over-an-hour-long prosecution closing argument—not extensive remarks that pervaded the entire closing. Third, the evidence of guilt was, as this record indicates and Tevis doesn't dispute, otherwise overwhelming—indeed, the jury saw video of Tevis directly shooting Crocker in the chest.[15] *See also* DE #16-2, at 31 (a prior Tevis brief stating, "it is undisputed that he fired the fatal shot"). Fourth, the trial court, although it overruled the mid-closing defensive objection, had previously given an appropriate instruction regarding non-consideration of a defendant's refusal to testify. *See Tevis*, 2016 WL 1273040, at *2 (quoting "an instruction to the jury": "The Defendant is not compelled to testify, and the fact that the Defendant does not testify is not an inference of guilt and shall not prejudice the Defendant in any way."); DE #14, at Disc labeled "22-4-14 DVD 210-3 12-11-14," at 9:24:50 a.m. The jury was well aware, pre-closing, that Tevis did not have to testify and possessed the written

---

[14] References like the ones at issue here "may not reflect on the defendant's failure to testify where witnesses other than the defendant could have contradicted the evidence." *Byrd*, 209 F.3d at 534. The Court "will not find manifest intent if some other explanation for the prosecutor's remarks is equally plausible." *Lent v. Wells*, 861 F.2d 972, 975 (6th Cir. 1988).

[15] That the jury acquitted on the murder charge demonstrates that it carefully evaluated the proof under the trial court's instructions.

instructions, post-closing, in the deliberation room. Considering the totality, the comments here compare favorably to those in *Bowling* and *Byrd*—"statements that only upon reflection marginally touch on [Petitioner]'s silence." 344 F.3d at 514. Such statements do not transgress the Constitution.[16]

Kentucky's courts, per this discussion, did not unreasonably apply or reach a decision contrary to *Griffin* in rejecting this argument.

C.    *Evidentiary Hearing*

The Court perceives no need for a hearing prompted by this petition. The motion and extensive record in the case conclusively show that Petitioner is entitled to no relief. *See* 28 U.S.C. § 2254(e)(2); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011) ("[W]hen the state-court record 'precludes habeas relief' . . ., a district court is 'not required to hold an evidentiary hearing.'" (quoting *Schriro v. Landrigan*, 127 S. Ct. 1933, 1940 (2007))); *Williams*, 120 S. Ct. at 1488-91; *Ivory v. Jackson*, 509 F.3d 284, 298 (6th Cir. 2007); *Stanford v. Parker*, 266 F.3d 442, 459-60 (6th Cir. 2001) (evidentiary hearing not required under § 2254 when "the petitioner's claims are . . . without merit."). Accordingly, Tevis is not entitled to an evidentiary hearing.[17]

---

[16] Bizarrely, at the end of the Reply, Tevis appears to concede as much: "[C]ounsel in the case at bar did not draw the jury's attention to his silence in any way shape or form." DE #18, at 12 (all as in original). This appears to be inconsistent with the remainder of Petitioner's argument.

[17] Tevis also cursorily requests appointment of counsel. DE #1-2, at 2. Foundationally, there is no right to appointment of counsel in habeas proceedings. *Pennsylvania v. Finley*, 107 S. Ct. 1990, 1993 (1987). The Criminal Justice Act grants courts discretion to provide court-appointed counsel to indigent § 2254 petitioners upon a determination that "the interests of justice so require[.]" 18 U.S.C. § 3006A(a)(2)(B). Because "[h]abeas corpus is an extraordinary remedy for unusual cases[,]" *Lemeshko v. Wrona*, 325 F. Supp. 2d 778, 787 (E.D. Mich. 2004) (quotation omitted), courts appoint counsel only in "exceptional cases." *Id.* at 788. Tevis does not here justify an appointment; his petition is not unusually legally or factually complex, the case is facially developed and analytically clear, and the claims all conclusively fail. The Court thus denies the request.

## IV.    CERTIFICATE OF APPEALABILITY

A Certificate of Appealability may issue where a petitioner has made a "substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). This standard requires a petitioner to demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 120 S. Ct. 1595, 1604 (2000); *see also Miller-El*, 123 S. Ct. at 1039-40 (discussing development of standard). The reviewing court must indicate which specific issues satisfy the "substantial showing" requirement. *See* 28 U.S.C. § 2253(c)(3); *Bradley v. Birkett*, 156 F. App'x 771, 774 (6th Cir. 2005) (noting requirement of "individualized assessment of . . . claims") (citing *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001)). For dismissals on procedural grounds, as to when a Certificate of Appealability should issue, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 120 S. Ct. at 1604. Petitioner has not made a "substantial showing" as to any claimed denial of rights; his claims all conclusively fail. Per the above discussion, reasonable jurists would not find the Court's determinations debatable. Accordingly, the Court recommends that the District Court entirely deny a Certificate of Appealability.

## V.    CONCLUSION

For the stated reasons, the Court **RECOMMENDS** that the District Judge **DISMISS WITH PREJUDICE** the petition (DE #1) and **DENY** a Certificate of Appealability.

*    *    *    *    *

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights and mechanics concerning this Recommended Disposition, issued under subsection (B) of the statute. Within

22

fourteen days after being served with a copy of this decision, any party may serve and file specific written objections to any or all findings or recommendations for determination, *de novo*, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *Thomas v. Arn*, 106 S. Ct. 466 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

This the 29th day of September, 2017.



Signed By:

**Robert E. Wier**

**United States Magistrate Judge**